

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-13-00886-CR

Jimmy **TURNER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR6595B
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  June 17, 2015

AFFIRMED

A jury convicted appellant Jimmy Turner of felony injury to a child.  The trial court sentenced Turner to fifty years' confinement and assessed a $5,000 fine.  On appeal, Turner contends the evidence is insufficient to support his conviction.  We affirm the trial court's judgment.

### BACKGROUND

On May 17, 2012, two-year-old B.A. began experiencing symptoms of distress, including fever, vomiting, and a distended belly.  Her mother, C.A., took her the Santa Rosa Children's

Hospital emergency room around 10:00 p.m. After the child was triaged by staff, C.A. was told it would be a while before a doctor could see B.A. C.A. left with B.A. without seeing a doctor. However, B.A.'s symptoms worsened. She was taken back to the hospital by ambulance in the early morning hours of May 19, 2012. After an examination, the doctors and staff determined B.A. was a victim of physical abuse. The evidence showed she had bruises to both arms, bruises around her belly, bruises on her back, and large bruises on each side of her pelvis. After further examination, which included a CAT scan and an MRI, B.A. was asked who had hurt her. B.A. stated "Blackie" hurt her. Blackie is Turner's nickname.

Hospital staff contacted police who came to the hospital. Ultimately, police arrested C.A. and Turner. Turner was charged with felony injury to a child.

At his trial, Turner claimed he could not have inflicted the injuries suffered by B.A. because on May 17, 2012 — during the time period in which he contends the injuries must have been inflicted — he was appearing in court on charges unrelated to this matter, and was arrested later that same day for failing to return for a urinalysis exam. He was still in custody when C.A. took B.A. back to the hospital on May 19, 2012.

After deliberations, a jury found Turner guilty of intentionally or knowingly causing serious bodily injury to B.A., a child fourteen years of age or younger. Turner elected to have the trial court assess punishment, and as noted above, the court sentenced Turner to fifty years' confinement and assessed a $5,000 fine. Turner ultimately perfected this appeal.

## ANALYSIS

In two points of error, Turner challenges the sufficiency of the evidence. More specifically, Turner contends the evidence is both legally and factually insufficient to support his conviction. Although Turner raises both legal and factual sufficiency challenges, the Texas Court of Criminal Appeals abolished factual sufficiency review several years ago. *See Howard v. State*, 333 S.W.3d

137, 138 (Tex. Crim. App. 2011) (citing *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010) (plurality opinion)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd).  Accordingly, we will review Turner's appellate complaints as a challenge to the legal sufficiency of the evidence.  *See Mayberry*, 351 S.W.3d at 509.

### *Standard of Review*

In reviewing the legal sufficiency of the evidence in a criminal case, an appellate court uses the standard established by the United States Supreme Court in *Jackson v. Virginia. Wilson v. State*, 448 S.W.3d 418, 425 (Tex. Crim. App. 2014); *Brooks*, 323 S.W.3d at 895 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Mayberry*, 351 S.W.3d at 509.  In reviewing a legal sufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Mayberry*, 351 S.W.3d at 509 (citing *Jackson*, 443 U.S. at 319); *see Wilson*, 448 S.W.3d at 425.  We must determine whether any necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict.  *Mayberry*, 351 S.W.3d at 509 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (holding that standard of review is same for both direct and circumstantial cases).  However, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

Moreover, an appellate court must remain mindful not to reweigh the evidence or substitute its judgment for that of the jury.  *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony,

and the jury may accept or reject all or any part of a witness's testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Thus, inconsistencies in testimony must be resolved in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). The jurors maintain the power to draw reasonable inferences from basic facts to ultimate facts; and it is their sole province to reconcile any evidentiary conflicts. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.). We must therefore defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013) (citing *Brooks*, 323 S.W.3d at 899).

### *Application*

Based on the indictment, the State had to prove beyond a reasonable doubt that Turner intentionally or knowingly caused serious bodily injury to B.A., a child fourteen years of age or younger, by striking her with his hand, grabbing her with his hand, shaking her with his hand, or striking her with or against an unknown object. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West 2011) (stating offense of injury to a child occurs when person intentionally, knowingly, recklessly, or with criminal negligence causes a child[1] serious bodily injury[2]). Turner contends the evidence is insufficient to prove he caused serious bodily injury to B.A. based on the timeline of events. Specifically, Turner claims that "whatever happened to this child occurred between the 17th and the 19th when she manifested in the hospital." Turner points out he was in in custody during these time periods, making it impossible for him to have inflicted the injuries. Turner argues that his

---

[1] Section 22.04(c) defines "child" as a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(c).
[2] Serious bodily injury is defined as "bodily injury that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

known whereabouts from the evening of May 17th through the 19th, coupled with witness testimony regarding B.A.'s physical appearance and health from May 16th to the time he was arrested and incarcerated, establish he could not have inflicted the injuries. In support of his contention, Turner relies on several witnesses to establish his whereabouts and B.A.'s physical condition during the time period in which he contends the injuries to B.A. must have been inflicted.

Turner called his former trial attorney, Cleophus Marshall, as a witness. Mr. Marshall testified he appeared with Turner in court on the morning of May 17, 2012, on an evading arrest or detention charge. C.A. and her children were there as well. Mr. Marshall testified B.A. appeared to be a "normal two-and-a-half-year-old child." She did not appear upset, angry, or disheveled. B.A. was wearing a dress with spaghetti-straps and sandals. Mr. Marshall stated that at times during the morning he was physically "very close to her," even sitting next to her, and did not see any bruises or scabs — particularly the bruises and other injuries to B.A.'s arms, facial area, and hands, which were depicted in several photographs admitted into evidence as State's exhibits. He described B.A.'s interaction with Turner as normal, stating she did not appear afraid or cautious.

Mr. Marshall testified that although the trial court granted Turner's request for probation, it mandated that Turner submit to a urinalysis exam. Everyone walked downstairs from the courtroom, including B.A. According to Mr. Marshall, she showed no signs of discomfort or pain as they walked. C.A. and the children remained in the courthouse cafeteria while Mr. Marshall walked with Turner to the probation department. They discovered they would have to wait two hours for the urinalysis test, so as it was around the lunch hour, the men decided to leave and return for the test. Mr. Marshall arrived back in the courtroom around 1:30 or 2:00 p.m., but Turner did not appear. The trial court advised Mr. Marshall that if Turner did not appear by 5:00 p.m., a warrant would be issued for his arrest. Turner did not appear and an arrest warrant was issued.

Turner also relies on testimony from his father, Jimmy Lynn Turner Sr. Turner's father testified he saw B.A. on May 16th when he hosted a gathering at his home. B.A. came to the gathering with Turner, C.A., and her infant half-brother. The event began in the late afternoon, and Mr. Turner saw B.A. during dinner and he checked on her while she was playing in a bedroom. Mr. Turner was not with B.A. during the entire visit, but he denied that anything unusual happened. B.A. left with her family, around 1:00 or 2:00 a.m. on the morning of May 17th.

Mr. Turner then testified he saw B.A. later on May 17th, sometime after 5:00 p.m., likely between 5:00 and 7:00 p.m. During the afternoon of May 17th, Turner's attorney, Cleophus Marshall, called Mr. Turner, advising him that a warrant had been issued for his son's arrest because he failed to reappear in court. In response, Mr. Turner and his wife left their home, looking for their son, who was driving one of their vehicles. Ultimately, the Turners saw their vehicle in a parking lot surrounded by police cars. Mr. Turner saw that his son was in police custody and C.A. and B.A. were sitting on a curb with the baby. Mr. Turner said he spoke to C.A. and B.A. Mr. Turner recalled that B.A. was wearing a "little dress with spaghetti straps" and showed no signs of injuries and did not appear to be in any distress. Mr. Turner admitted he could not see the areas of B.A.'s body that were covered by the dress. Mr. Turner stated he had no concerns about B.A.'s health or well-being at that time.

Turner next refers the court to the testimony of two officers who were in the parking lot the afternoon he was arrested. Turner suggests the officers' testimony is further evidence he could not have inflicted injuries to B.A. because neither officer noticed her — although one of the officers did note B.A.'s presence in his report — and if she had the injuries claimed by the State, surely they would have taken note.

Based on the foregoing, Turner contends the evidence is insufficient to support his conviction. According to Turner, it is undisputed he remained incarcerated from the evening of

May 17th, when B.A. was taken to the hospital the first time, until sometime after May 19th, when B.A was taken to the hospital the second time. He argues that given the timeline and witness testimony that B.A. was in good physical condition — no bruising, scratches, or other apparent injuries — immediately prior to his incarceration, he is entitled to an acquittal. However, the State points to other evidence in the record, arguing it shows Turner had access to the child during the time in which the injuries could have been inflicted, and it was in fact Turner who caused the serious bodily injuries suffered by B.A.

The State called four health professionals to testify. Erica Marie Dominguez, supervisor for Health Information Management at the hospital, authenticated B.A.'s medical records from May 17th and May 19th. After authentication, the medical records were admitted into evidence without objection. The medical records were relied upon by the other medical witnesses.

The State then called Dr. Curtis Donald Froelich, who is board certified in pediatrics and pediatric critical care. Dr. Froelich, the medical director for the hospital's pediatric intensive care unit ("PICU") during the relevant time period, testified he was on duty May 19th when B.A. was admitted to the PICU, and he saw her on both the 19th and the 20th. The doctor testified B.A. arrived at the emergency room at approximately 4:15 a.m. where she was evaluated by the emergency room physician and a trauma surgeon. Thereafter, B.A. was admitted to the PICU where he monitored her. Dr. Froelich described B.A.'s injuries — those he observed and those relayed by those who conducted tests on B.A. The injuries he described included a distended abdomen with bruising, possible blood in the abdomen, swollen intestines, four rib fractures, bruising to the back, brain asymmetry (the two sides of B.A.'s brain "didn't seem the same"), and significant acute anemia suggesting internal bleeding.

Dr. Froelich talked about the rib fractures, stating it takes "a tremendous amount of force" to fracture the rib of a two-year-old like B.A.[3] The type of fractures suffered by B.A. are commonly seen in high-speed vehicle collisions when a child is ejected from the vehicle. He also noted that the brain asymmetry shown by the MRI caused the staff to conduct a CAT scan on May 21st, which showed bleeding on the brain, i.e., "a small blood collection on the left side over the brain known as a subdural hematoma," which is abnormal in a child. The multiple areas of bruising on B.A.'s body were consistent with an application of force. Based on B.A.'s injuries and all the other test results — and after excluding other possible causes — Dr. Froelich concluded B.A.'s injuries were the result of trauma — "a tremendous amount of force was applied to her body." Given that B.A. presented at the hospital with no history of trauma, e.g., no car accident, fall, etc., Dr. Froelich opined the trauma appeared "nonaccidental" and concluded that other than "nonaccidental trauma," there was no feasible explanation for B.A.'s injuries. The doctor testified the injuries suffered by B.A. created a substantial risk of death, serious, permanent disfigurement, and protracted loss or impairment of bodily members or organs.

As to the age of the injuries, Dr. Froelich testified the bruising indicated "multiple different stages" of healing, further noting that not every traumatic injury manifests at the same rate. When asked to characterize the age of the injuries after observing B.A. and reviewing her test results, the doctor specifically testified B.A. was injured "not more than a week ago, or a week prior to her visit on the 19th." On cross-examination, Dr. Froelich admitted it was possible the trauma observed on the 19th could have occurred after B.A.'s May 17th visit to the emergency room.

---

[3] Dr. Froelich later testified that he had been required, in the past, to perform CPR on a two-year-old and even after throwing his full weight into the chest compressions, he had never seen a rib fracture. Thus, it would take more pressure than what he would exert in performing chest compressions with his full weight to fracture the ribs of a two-year-old.

However, he later clarified, stating that given B.A.'s vital sign changes, it was less likely the injuries occurred between the 17th and the 19th, and most likely they occurred before May 17th.

As to whether B.A. would exhibit signs of pain, Dr. Froelich testified it varies among patients. Some children may cry at the time of the initial trauma, but later merely feel uncomfortable, acting abnormally, but not inconsolable.

Next, the State called Cynthia Garcia, a registered nurse at the hospital where B.A. was admitted. Ms. Garcia testified she is a "child abuse forensic nurse examiner," explaining that she conducts "specialized examination on children where there's suspected abuse, whether it's sexual abuse, physical abuse or neglect." Ms. Garcia stated that on May 19, 2012, she was asked by the emergency room doctor to examine B.A. Ms. Garcia stated she first spoke with C.A. as the doctors were working on B.A. who was in a "critical state." When she asked C.A. how B.A. received the bruises on her body, C.A. told her B.A. was playing with C.A.'s fourteen-year-old cousin the two days before, but C.A. did not notice any bruises until the 19th. C.A. admitted Turner "plays rough" with B.A., but said Turner "left like five days ago." C.A. denied Turner hit or spanked B.A. C.A. identified Turner by his nickname, Blackie, and admitted he was staying with her in the apartment.

After speaking with C.A., Ms. Garcia spent approximately an hour and a half with B.A., talking to her and examining her. Ms. Garcia described B.A. as awake, alert, and having good eye contact. Ms. Garcia asked B.A. if anyone hurt her, and B.A. said, "Blackie hit my tummy. He hit my tummy. Blackie hit my tummy." Ms. Garcia said B.A. was quiet — in and out of sleep — and "splinting," which she described as moving in a certain way to minimize pain. And, although Ms. Garcia testified B.A.'s injuries would have been painful, Ms. Garcia noted B.A. was not crying. In fact, Ms. Garcia stated that even when children are in a lot of pain, they may still be "very playful[,] jumping around." Ms. Garcia described B.A.'s external injuries for the jury, and

specifically testified the bruises were "significant" and darker than they appear in the photographs. However, Ms. Garcia admitted she could not determine the age of B.A.'s injuries.

The State also called Dr. Sandee A. Narang in its case-in-chief. When B.A. was brought to the hospital in May 2012, he was an assistant professor of pediatrics with the University of Texas Health Science Center in San Antonio. He now holds the same position in Houston. Dr. Narang testified that there is a clinic, the Center for Miracles, associated with the university. The Center "is a clinic for evaluation and treatment of children" who are suspected of suffering from abuse and neglect. Dr. Narang evaluated B.A. for abuse.

Dr. Narang first saw B.A. on May 19, 2012 in the ICU. He was asked by Dr. Froelich to evaluate B.A. for possible "abusive injury, nonaccidental trauma." Dr. Narang first sent Dr. Melville, "the fellow" he was supervising, to evaluate B.A. Dr. Melville told Dr. Narang that when he asked B.A. how she had gotten her "owies," she told him, "Blackie hit my tummy." Other than that, B.A. did not speak much. After speaking with Dr. Melville, Dr. Narang personally evaluated B.A.

He first noticed B.A. appeared to be "very sad" and was almost nonresponsive to many of the medical interventions that were going on. Unlike most children her age, she showed no resistance. When he was alone with B.A., he also asked her how she had gotten her "owies." As before, B.A. said, "Blackie hit my tummy." Dr. Narang asked her to show him where Blackie hit her and she pointed to different points in her belly area.

As did Dr. Froelich and Ms. Garcia, Dr. Narang described B.A.'s injuries as noted in the medical records. He described the injuries to B.A.'s ears as those which usually occur when a child's ear is "yanked." Dr. Narang also testified the bruising on the abdomen was "remarkable" because doctors do not typically see bruising on the abdomen because it does not have a bony surface. Therefore, to cause bruising to the abdomen requires a great deal of force because it

usually means the "contends of the abdomen have been compressed against the bony surfaces of the spine." Dr. Narang agreed with Dr. Froelich that the rib fractures would require a lot of force — like that sustained in a motor vehicle accident. As for the subdural hematoma or brain bleed, Dr. Narang testified he saw more than one, indicating to him B.A. had been shaken or traumatized on more than one occasion. He said the CAT and MRI results showed B.A. had two appearances of blood on her brain of different ages.

As for the time frame of the abdominal injuries, Dr. Narang testified it is difficult to estimate time of injury. He explained the abdominal cavity has the capacity to deal with inflammation without noticeable symptoms for several days, even weeks. A child may look fine, but will later begin vomiting and complaining of pain. Moreover, a child may "wax and wane," exhibiting periods of illness and periods of wellness. As for the rib fractures, Dr. Narang testified they were fresh fractures, showing no healing. Accordingly, the injuries happened within a week of May 19th. With regard to the brain injuries, the doctor said a CAT scan will show fresh blood from zero to seven days. Thus, if a child suffered any sort of traumatic event — shaking or impact — it would appear the same way if it was a few hours old or up to seven days old. After that, the appearance of the brain bleed on the CAT scan will change. However, the MRI will produce narrower results with regard to time frame. In this case, Dr. Narang testified the MRI established at least one of the brain injuries was "[p]robably a couple of weeks [old] or older." Specifically, he stated one of the injuries was definitely caused within seven days of May 19th — so as early as May 12th — the other injury "was definitely at least a couple of weeks old." However, on cross-examination, Dr. Narang admitted some of the injuries, including the abdominal injury, could have occurred on May 18th. He later clarified that B.A. "definitely had a certain level of abdominal injury" on May 17th, when she was first brought to the hospital, given the records showing she presented with a "firm and distended abdomen," as well as other symptoms. Dr. Narang could not

rule out the possibility that she suffered an additional traumatic injury to the abdomen on the 18th, but believed "the aggregate picture points to before the — before the 17th, and that's because we know abdominal injuries take a while to really show up."

Dr. Narang stated B.A.'s injuries were severe and critical. The injuries created a substantial risk of death, could cause serious, permanent disfigurement, and protracted loss or impairment of bodily members or organs. Dr. Narang testified B.A.'s injuries could have been caused if she was struck with a hand, shaken with a hand, or struck with or against an object. Dr. Narang concluded by opining B.A.'s injuries were the result of inflicted trauma, not an accident.

The State also called Norma Linda Alonzo, C.A.'s cousin. Ms. Alonzo testified Turner was C.A.'s boyfriend and that his nickname is "Blackie." When asked if everyone referred to Turner by this nickname, she said they did. From the stand, she identified Turner as the man known as Blackie.

Ms. Alonzo testified that at times, she would stay with C.A. and Turner in C.A.'s apartment. In 2012, when she was staying with the couple, B.A. came to her and Ms. Alonzo saw bruising on B.A.'s stomach, arm, and back. Ms. Alonzo reviewed the photographs of B.A.'s injuries, which were admitted into evidence, and testified the bruises depicted in the photographs were the ones she saw on B.A.'s body. She also noticed B.A.'s stomach "looked like a hard basketball." Ms. Alonzo told C.A. she needed to take B.A. to the hospital. They took B.A. to the emergency room, but C.A. did not want to wait, saying she was going to take B.A. to another hospital. However, C.A. simply took B.A. home.

Ms. Alonzo testified that at times, Turner was "good to" B.A. However, at times he was verbally abusive with the child and sometimes committed acts "that were mean." For example, he once placed B.A. on top of the refrigerator until she cried and C.A. was forced to ask Turner to take her down. At other times, Turner would take B.A. upstairs and Ms. Alonzo "would hear

banging or like something, you know, when you hit the wall or something." Sometimes, when B.A. came downstairs after being with Turner, she would tell Ms. Alonzo, "Blackie hit me right here. Blackie hit me." B.A. would show Ms. Alonzo her arm and back, saying that is where Blackie hit her. B.A. would not cry, but would look scared. Ms. Alonzo testified these incidents happened before C.A. first took B.A. to the hospital on May 17, 2012.

Based on the foregoing evidence, we hold the jury could have found Turner guilty beyond a reasonable doubt. Turner's basic contention is that he could not have committed the offense, i.e., inflicted injury upon B.A., because she was injured between May 17th and May 19th, at a time when Turner had no access to her. According to Turner, witness testimony established not only his whereabouts during this time, but also showed B.A. was fine until sometime after he was incarcerated. However, Turner ignores the evidence presented by the State, evidence that shows B.A. could have been injured as early as May 12th or May 13th, a time period in which Turner had access to B.A. Moreover, Turner had access to B.A. from midday on the 17th until his arrest later that day.

Dr. Froelich specifically testified the bruising indicated "multiple different stages" of healing and opined B.A. was injured "not more than a week ago, or a week prior to her visit on the 19th." He specifically stated it was less likely the injuries were inflicted between the 17th and the 19th, and most likely they occurred before May 17th. Dr. Narang's testimony was similar. He explained that abdominal injuries, such as those suffered by B.A., may not produce noticeable symptoms for several days, even weeks. As for the rib fractures, Dr. Narang testified they could have occurred within a week of May 19th — again, a period of time in which Turner had access to B.A. Moreover, Dr. Narang testified that at least one of the brain injuries was "[p]robably a couple of weeks [old] or older," and the other one occurred within seven days of May 19th — so as early as May 12th. Thus, both doctors presented testimony that at least some of B.A.'s injuries

could have occurred as early as May 12th or 13th, a time when Turner was not incarcerated and therefore had access to B.A.

As to the testimony presented by Turner from his former attorney, his father, and the police officers as to B.A.'s condition and appearance on May 16th and May 17th, the gist of the testimony was that none of them noticed any injuries on B.A. or that she was acting abnormally. However, the jury was free to reject this testimony, particularly given the witnesses' relationships with Turner, or it might have noted that the witnesses would have been unable to see certain injuries — subdural hematomas, fractured ribs, abdominal injury. Moreover, Dr. Froelich testified exhibition of pain varies and some children may cry when they are first injured, but later merely feel uncomfortable. Dr. Narang testified that with an abdominal injury, a child may appear fine for a time and then appear ill — going back and forth. And, Ms. Garcia testified that even when children are in a lot of pain, they may still be "very playful[,]" jumping around.

We also note that B.A. identified "Blackie" as the one who caused the injuries to her abdomen, telling at least four people he was responsible. Other witnesses testified Turner was known by the nickname "Blackie." B.A. never identified any other person as causing her injuries. The doctors testified the injuries suffered by B.A. created a substantial risk of death, could cause serious, permanent disfigurement, and protracted loss or impairment of bodily members or organs. Dr. Narang testified B.A.'s injuries could have been caused if she was struck with a hand, shaken with a hand, or struck with or against an object. Both doctors concluded the child's injuries were not accidentally inflicted, but were the result of trauma.

At best, the evidence is conflicting as to when B.A. was injured, and the witnesses' credibility was paramount. And as noted above, inconsistencies in testimony must be resolved in favor of the verdict, *Gonzales*, 330 S.W.3d at 694, and witness credibility and the weight to be given to any particular witness's testimony is solely within the jury's province. *Lancon*, 253

S.W.3d at 707. Accordingly, applying the appropriate standard of review and deferring to the jury's right to weigh the evidence, assess credibility, and resolve conflicts, we hold the jury, as a rational trier of fact, could have found beyond a reasonable doubt that Turner committed the offense of injury to a child as charged in the indictment. *See Mayberry*, 351 S.W.3d at 509.

## CONCLUSION

After reviewing the evidence in the light most favorable to the verdict, and deferring to the jury as we must, we hold the evidence was sufficient to support Turner's conviction. Accordingly, we overrule Turner's appellate issue and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish